IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 15, 2018 Session

**STATE OF TENNESSEE v. KYLE ALEX BATIZ**

**Appeal from the Circuit Court for Montgomery County
No. 63CC1-2014-CR-817  William R. Goodman, III, Judge**

_____

**No. M2017-02065-CCA-R3-CD**

_____

The Defendant, Kyle Alex Batiz, was convicted of aggravated child abuse and reckless homicide and was sentenced, respectively, to concurrent sentences of 21 years at 100% and 3 years at 30 percent.  On appeal, he argues that the evidence was insufficient to sustain the conviction for aggravated child abuse; the trial court erred by not suppressing his text messages and statement to police; the trial court erred by allowing a forensic pathologist to testify regarding matters not within her expertise; he should have been sentenced as an especially mitigated offender; and the conviction for aggravated child abuse should be reversed because of cumulative errors that occurred during the trial.  We have reviewed the record in this matter and conclude that the issues raised by the Defendant are without merit.  Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Kevin McGee, Nashville, Tennessee, and William D. Massey, Memphis, Tennessee, for the appellant, Kyle Alex Batiz.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On May 15, 2014, while in the sole care of the Defendant, her stepfather, the one-year-old victim was fatally injured. The Defendant called 911 and ultimately was charged with the death of the victim. According to the Defendant, the injuries resulted from the victim's falling from a two-foot ottoman onto a toy. The State's witnesses testified that the injuries to the victim were so devastating that they could not have resulted from such a fall. We will set out the proof in this matter.

## Suppression Hearing

The trial court heard the Defendant's motions to suppress on February 10, 2016. The Defendant sought to suppress his statements made to police and text messages obtained from his phone. He asserted these statements were elicited in violation of the Fourth and Fifth Amendments, and the text messages were obtained in violation of the Fourth Amendment.

Officer Arthur Bing, a patrol officer with the Clarksville Police Department ("CPD"), testified at the hearing that his supervisor called him to the Defendant's apartment on May 16, 2014, because there was "an individual who needed transportation voluntarily down to a different office, at Special Operations." Officer Bing affirmed that the Defendant was not restrained "in any way" when he arrived at the apartment, and it was Officer Bing's understanding that "this individual was not in police custody[.]" Officer Bing transported the Defendant to the Special Operations Unit ("SOU") office, and the Defendant rode unrestrained in the backseat because Officer Bing "ha[d] two loaded weapons as part of [his] patrol unit[,]" and not allowing individuals to ride in the front seat "keeps people from getting access to those." As a matter of general practice, Officer Bing kept the Defendant's "wallet, phone, and a vaporizer" in the front seat of the patrol car during the trip to the SOU. Officer Bing explained that whenever he transports an individual, he "collect[s] their personal belongings and hold[s] them until [they] get to the location, and then [he] will give them back to them[,] and they agree to it." The Defendant's personal items were not placed in an evidence envelope. He stated that he normally placed personal items "on [his] front patrol bag . . . right on top of there . . . in the passenger seat area."

When Officer Bing and the Defendant arrived at the SOU, the building had closed for the day. Detective Michael Ulrey had to open the building because Officer Bing did not have a key. Officer Bing "had to open the door [of the patrol car] for [the Defendant]" because there were no handles on the inside of the backseat. Officer Bing walked behind the Defendant into the SOU, without touching him or placing him in restraints. Detective Ulrey took the Defendant to an interview room, and Officer Bing waited at the SOU because the Defendant "would need a ride back to his home" and affirmed that he was "sort of like a chauffeur[.]" On cross-examination, Officer Bing

explained that a key was not needed to exit the SOU building. He affirmed that a person in the backseat of a patrol vehicle could not exit the vehicle unless someone opened the backseat door from the outside. Officer Bing agreed that the Defendant had voluntarily gone to the SOU and voluntarily walked from Officer Bing's patrol car into the building.

Detective Ulrey testified that he worked as a death investigator in the CPD's SOU division. He was assigned to investigate the victim's death and arrived at the Defendant's apartment shortly after the victim was transported to the hospital. He encountered the Defendant inside the apartment and described the Defendant's demeanor as "visibly upset" but "very cooperative." Detective Ulrey explained that the Defendant "answered all [his] questions" and "agreed to assist [Detective Ulrey] in . . . anything that [he] thought needed to happen." The Defendant signed a consent form for Detective Ulrey to bring in a team to search and process the apartment. Detective Ulrey explained to the Defendant that he would need to "come back to [Detective Ulrey's] office to sit down so [Detective Ulrey] could take a formal statement[.]" The Defendant agreed to do so without hesitation. When asked why Detective Ulrey did not take the Defendant's statement in the apartment, he explained that the team processing the apartment was "very meticulous on what they do[,] and his apartment was going to get crowded[,] and it's standard practice when documenting statements from people[] for [police] to take them back to our office." He further explained that his office had audio/video recording capabilities, unlike the Defendant's apartment.

Detective Ulrey affirmed that the Defendant was not in custody while he was in Officer Bing's patrol car, and he even told other officers that the Defendant "was going down voluntarily." Detective Ulrey affirmed that "there had been no decision at that point to arrest [the Defendant.]" While driving from the Defendant's apartment to the SOU, Detective Ulrey received a phone call from Detective Ewing, who was at the hospital with the victim. Detective Ewing "explained to [Detective Ulrey] the bruising and placements of the bruising on [the victim]'s body."

Upon arriving at the SOU, Detective Ulrey had to let Officer Bing and the Defendant into the building because it was locked. Detective Ulrey explained that during business hours, the SOU has a receptionist who controls "traffic coming in and out [] via the front door into the lobby[,]" and he affirmed that "people can come into [the SOU] lobby from the outside" during business hours. However, the receptionist always locked the exterior door when she left at the end of the work day, and if "investigators have someone coming in, [they] are responsible for meeting them and bringing them to the door." Officer Ulrey agreed that a key was not needed to exit the SOU when the doors were locked. The Defendant was led to an interview room with two unlocked doors and remained unrestrained and not in custody. Detective Ulrey affirmed that if "you are in the [interview] room and the doors are unlocked," there is nothing "keeping you from

opening the door and going out[.]" The Defendant "never asked to leave" and did not "express any reservation about going into that [interview] room and talking to [Detective Ulrey.]" The interview was both audio and video recorded.

Upon entering the interview room, Detective Ulrey explained to the Defendant the requisite forms that needed to be addressed, specifically the interview sheet, the Miranda waiver, and the Sudden Unexplained Infant Death Investigation ("SUIDI") form. Detective Ulrey filled out the interview sheet with the Defendant, which is filled out "in all cases" and "documents who [police] are talking to and just general information about" that person. Although the Defendant was not in custody and Detective Ulrey had not made the decision to arrest him, Detective Ulrey read the Defendant his Miranda rights because "there were enough questions with this case[] that I was afraid [the Defendant] may make some incriminating statement to me during our conversation[,] and I wanted him to fully understand his rights that were reduced to writing." After Detective Ulrey explained his Miranda rights to the Defendant, the following exchange occurred:

> [The Defendant]: . . . [i]s there anyway way I could—'cuz my—my dad's, uh, girlfriend is a lawyer; is there any way I—I'd be able to talk to her first?
>
> Detective Ulrey: Before you talk to me at all?
>
> [The Defendant]: . . . [A]bout anything.
>
> Detective Ulrey: . . . [If] you are asking to talk to an attorney, that is absolutely shutting me down.
>
> [The Defendant]: Okay. Then no—
>
> Detective Ulrey: That—
>
> [The Defendant]: No.
>
> Detective Ulrey: . . . I'm just—I want you to understand I'm trying to figure out what happened.
>
> [The Defendant]: Okay.
>
> Detective Ulrey: If you are telling me that you want to talk—you—you understand your rights; if you're telling me you wanna [sic] talk to an attorney before you talk to me, then I can't talk to you anymore.

- 4 -

[The Defendant]: Okay.

Detective Ulrey: Okay. Um . . .

[The Defendant]: I don't have any problem—

Detective Ulrey: But it—

[The Defendant]: I don't have a problem with you talking to me.

Detective Ulrey: Okay. All right.

[The Defendant]: I don't.

Detective Ulrey: I just don't—wanna [sic] make that clear.

[The Defendant]: Okay.

Detective Ulrey: All right. All right. Um if you would, just sign here.

[The Defendant]: Okay.

Based on this exchange, Detective Ulrey did not believe that the Defendant was asking for an attorney. If the Defendant had, Detective Ulrey testified that he would have "shut down the interview and walked out." After this exchange, Detective Ulrey started going over the SUIDI form, which "is a standard form given to [police] by the State [that] . . . the medical examiner uses . . . in their investigation, during the autopsy." Detective Ulrey acknowledged that the Defendant did not finish filling out the SUIDI form but explained that Ms. Denny, as the victim's primary caretaker, completed a SUIDI form with Detective Ewing.

The Defendant was given water and a restroom break during the interview at the SOU. Detective Ulrey walked the Defendant to the restroom because it was "a secure area . . . they require us to just escort [the public] at least to the bathroom." He did not enter the restroom with the Defendant but waited outside. Detective Ulrey agreed that he "had a fair amount of information about the death of the [victim]" even prior to the Defendant's restroom break, and Detective Ulrey did not "think there had been any other adults present" at the Defendant's apartment based on the information he had. After Detective Ulrey walked the Defendant back to the interview room, he went and spoke with Detective Ewing, who had just returned to the SOU from the hospital. Detective Ewing showed Detective Ulrey photographs of the victim at the hospital, including the

bruising on her body. Detective Ulrey returned to the interview room after speaking with Detective Ewing. The Defendant "was still being very cooperative, so . . . we just still had [a] conversation during the course of the investigation."

Detective Ulrey affirmed that "at some point" during the interview, the Defendant explained that he had sent Ms. Denny test messages "to explain what had happened." The Defendant gave his consent for Detective Ulrey to look at the text messages on his cell phone, and the Defendant "even gave [Detective Ulrey] his unlock code for the phone." Detective Ulrey stated that he was also able to view the text messages on Ms. Denny's cell phone.

After speaking with the Defendant, Detective Ulrey "made the decision that [he] had enough probable cause to arrest [the Defendant.]" Detective Ulrey stated that he made the decision to arrest the Defendant after he "demonstrated striking his child and the force that he hit [the interview room] table and then also the way he described squeezing his child and the relevance of the bruises . . . from his hands onto that child[.]" Detective Ulrey testified that the entire length of his interview with the Defendant was "maybe an hour, an hour and a half," including the restroom break and the discussion about the Miranda waiver and other forms. Following the interview, Detective Ulrey spoke with the Defendant's wife, Rebecca Denny, who had been speaking with Detective Ewing. Detective Ulrey allowed Ms. Denny to go into the interview room to speak with the Defendant.

On cross-examination, Detective Ulrey affirmed that when he arrived at the Defendant's apartment, he did not have "reasonable suspicion to detain" the Defendant and "would have had no reason to stop him" if he decided to leave his apartment. Detective Ulrey acknowledged that he was carrying his weapon and that the Defendant knew that he was an investigator when the Defendant agreed to go to the SOU to give a statement. He also thought that the Defendant learned of the victim's death before Detective Ulrey arrived at his apartment. Detective Ulrey testified that after receiving the call from Detective Ewing regarding the victim's bruises, he had "reasonable suspicion to detain [the Defendant,]" and the Defendant was therefore not free to leave during the minutes between the Defendant sitting in the interview room alone and the start of the interview. Detective Ulrey rejected the assertion that he interviewed the Defendant "with the intention of getting a confession[.]"

Regarding the discussion about the Miranda waiver, Detective Ulrey testified on cross-examination that he "wanted to clarify whether [the Defendant] was actually asking for an attorney" after the Defendant mentioned his father's girlfriend. He further explained that "as [he] was trying to clarify with [the Defendant], [the Defendant] actually interrupt[ed] [Detective Ulrey] and sa[id] no, no, no, I want to continue."

- 6 -

Detective Ulrey testified that after hearing the Defendant's first explanation of what had happened, he did not believe the Defendant's assertion that the bruising on the victim's body had occurred when she fell on her toys, and he agreed that he did not have probable cause to arrest the Defendant at that point. The decision that there was probable cause to arrest the Defendant came from "a conglomeration" of the Defendant "slam[ing] [the interview room] table demonstrating he hit her or hitting [her] twice in the abdomen," or when the Defendant "did some type of crazy Heimlich maneuver by compressing her insides or when we figured out that bruis[es] on her back were consistent with where his fingers would be while he was squeezing her." Detective Ulrey reiterated that he did not believe that the Defendant was asking for a lawyer.

Following the suppression hearing, the trial court denied the Defendant's motions to suppress. The trial court found that police placing the Defendant in the backseat of Officer Bing's patrol car constituted a detention. However, the trial court went on to explain it was "appropriate that there be a brief investigatory detention, which would be supported by reasonable suspicion[,]" given that "the Defendant was the only other individual present in the apartment at the time that the [victim] sustained a fatal injury." The trial court further found that even if the detention was not justified, "the taint of the unlawful seizure had been sufficiently attenuated from the subsequent voluntary consent of the Defendant." The trial court additionally noted that Ms. Denny had also given consent to search the apartment. With respect to the <u>Miranda</u> waiver, the trial court reviewed the exchange between Detective Ulrey and the Defendant and found that the Defendant's signing the <u>Miranda</u> waiver form "serve[d] as a knowing voluntar[]y waiver of the Defendant's right to counsel for purposes of the interview."

## Trial

Shane Givens, Deputy Director of Montgomery County 911, testified that two 911 telephone calls were received on May 15, 2014, from the address where the Defendant and the victim were located. A recording of these telephone calls was played for the jury.

Marjorie Crist testified that she was a paramedic employed by Montgomery County Emergency Medical Services. On May 15, 2014, she responded to a "CPR in Progress" call at the address where the victim and the Defendant were located. At the scene, she observed a "one-year-old female on the floor with a male subject doing CPR on her." Paramedic Crist immediately picked up the victim and began chest compressions while carrying her to the ambulance. The victim did not have a pulse and was "very pail [sic]" with "dark bruising on her abdomen." Paramedic Crist continued to try to resuscitate the victim during transport to the hospital, but she was not breathing and did not have "any sort of electrical activity."

Richard McKee testified that he was employed by Clarksville Fire and Rescue and had responded to the call regarding the victim. The rescue truck he was riding in arrived after the police officers and the ambulance. He stated that "[e]verybody was just getting supplies to the upstairs" when he arrived. Upon seeing Paramedic Crist carrying the victim to the ambulance, Mr. McKee followed her to the ambulance and eventually took over chest compressions. He noticed that the victim did not have a pulse and had bruising on "the top of her forehead and her torso."

CPD Officer Michael Hackney testified that he and his partner answered a call to the Defendant's apartment on May 15, 2014. After the Defendant answered Officer Hackney's knock on the door, he followed the Defendant into a bedroom, where he saw the Defendant performing CPR on the victim. The victim was not breathing, and she "was pale, almost a yellowish jaundice color. [S]he had thrown up[,] and it was still on her face." The Defendant was performing "very fast and very shallow" CPR, like "he wasn't really doing anything for the child." Officer Hackney observed multiple bruises on the victim's chest and abdomen. After Paramedic Crist carried the victim to the ambulance, Officer Hackney began "to log everyone that came" to the scene.

At the apartment, the Defendant told Officer Hackney that the victim had fallen off an ottoman and hit her head on some toys, despite the Defendant's "grabb[ing] her by the ankle" as she fell. The Defendant said he put her to bed with a bottle and soon saw that she had not drunk from it. When she subsequently vomited, he called 911. When the Defendant was told that the victim had died, he vomited and became upset, yelling profanities and tearing a towel rack from the wall. This behavior lasted "roughly ten[]minutes[.]" Officer Hackney recalled that the Defendant called his father and asked him to come to Clarksville because "something had happened." The Defendant next telephoned Ms. Denny and told her he had "failed her." The Defendant also called the hospital, which informed him that the victim had died, and his mother. At one point, Officer Hackney "had to like pull [the Defendant] off the balcony" because he was afraid that the Defendant "was going to try and jump or do something crazy."

CPD Officer Jeffrey Derico testified that he was part of the crime scene team that was called to the Defendant's apartment on May 15, 2014. Officer Derico identified photographs that he had taken at the Defendant's apartment, including photographs of the ottoman that the Defendant said the victim fell from and the toys that were beside it. CPD Detective Scott Beaubien testified that he was also part of the crime scene team that was called to the Defendant's apartment on May 15, 2014. He collected multiple pieces of evidence from the apartment, including one of the toys that were beside the ottoman. CPD Sergeant Terry Minton testified that he was the CPD evidence department coordinator. He affirmed that the toy collected from the Defendant's apartment had remained in the evidence room from the time Detective Beaubien collected it until it was brought in to the trial court.

Kathy Denny, the victim's grandmother and the Defendant's mother-in-law, testified that the Defendant called her on May 15, 2014. Kathy[1] said that the Defendant said, "I'm so sorry" during the call and sounded "[r]eally very calm." The Defendant told Kathy that the victim "fell off the ottoman; she hit her stomach on a toy, and [he] tried to grab her[,] and her head hit the floor." Kathy did not know that the victim had died at the time of the telephone call.

Dr. Rachel Root testified as an expert in emergency medicine and stated that she was an emergency room physician at the hospital where the victim was taken on May 15, 2014. The victim was not breathing and her heart had stopped when she arrived at the emergency room. Electrical activity never restarted in the victim's heart, and Dr. Root eventually decided to terminate the resuscitation efforts when "her pupils were fixed and dilated," which indicated significant brain damage, and it was clear that electrical activity was not going to restart. Dr. Root testified that the victim was pale and had numerous bruises on her chest, abdomen, back, hairline, and left temple, and her abdomen was distended. These markings were not caused by resuscitation attempts in the emergency room.

The victim's mother, Rebecca Denny, testified that she married the Defendant when the victim was five months old. Although he seemed genuinely to care for the victim, he was stricter with her than was Ms. Denny. On May 15, 2014, Ms. Denny gave the victim a bath before leaving for work, and she testified that the victim did not have any bruises or markings at that time. Ms. Denny stated that the victim "had fallen on some [toy] blocks" earlier in the day, and the blocks left small nonvisible bumps on the victim's lower back but no bruising. The victim had also hit her head on the bathtub faucet the day before, leaving "a small bump in the center of her forehead." Ms. Denny affirmed that the victim was learning to walk and had previously "bumped her head on the wall." She also affirmed that several weeks prior, she heard the victim "grasp [sic] for air[,] and her face went blank." The victim "bruised like a peach" but was otherwise healthy. The aforementioned markings were not visible in the victim's postmortem photographs. After giving the victim a bath, Ms. Denny arranged for a friend to drive the victim to her babysitter's house because Ms. Denny's car was not working, and the Defendant later picked the victim up from the babysitter's house.

Ms. Denny testified that she received a text message at work from the Defendant several hours after she had arrived, stating that the Defendant "snapped on [the victim] accidentally for moving around on the ottoman and knocking over" the Defendant's

---

[1] Because Kathy Denny and Rebecca Denny share the same last name, we refer to Kathy Denny by her first name only for clarity. We mean no disrespect by this practice.

electronic cigarette. He specifically told Ms. Denny that he "snapped and hit her stomach[,] and it left a mark." Ms. Denny asked "how bad it [was,]" and the Defendant told her it was "[n]ot bad[,] you can just see a lil [sic] print[.]" The Defendant then sent Ms. Denny another text message, explaining that the victim's "toys were on the ground[,] she fell right on them[.] And I had her dressed[,] she threw up[.]" Ms. Denny asked if the victim had bruises from the incident, and the Defendant told her that the victim's "face [wa]s fine[,]" but she had bruises on "[h]er sternum and her stomach." At this time, Ms. Denny did not leave work to return to their residence because she "didn't think [the Defendant] was capable of anything close to this."

The Defendant thereafter called Ms. Denny and told her that the victim was not breathing and asked what he should do. Ms. Denny told him to call an ambulance, and a friend drove her back to the apartment. She arrived at their apartment as the ambulance was leaving with the victim, and Ms. Denny followed behind in "an EMT first responder truck" but did not know any details about the victim's condition. When she arrived at the hospital, hospital staff had Ms. Denny sit outside the exam room while they tried to resuscitate the victim.

On cross-examination, Ms. Denny rejected the assertion that the victim was anemic. She explained that although anemia "was suspected when [the victim] was a newborn, [they] had her hematocrit under control." Ms. Denny explained the details of the victim's "gasping for air" several weeks earlier, stating that the Defendant "picked [the victim] up by her shoulders and patted her on the stomach[,]" causing her to "cough really hard" and "spit up" before breathing normally again. On redirect examination, Ms. Denny affirmed that she had "minimized things" in her police statement immediately after the victim's death because she "just didn't believe [her] husband could do that to [her] daughter."

Jasiman Dykes testified that she picked the victim up and transported her to her babysitter's house on May 15, 2014. Ms. Dykes arrived at the Defendant and Ms. Denny's apartment an hour early so that the victim and Ms. Dykes' daughter could play together. The victim was "real playful" at the apartment but was "whiney and a little upset" during the car ride to the babysitter's house. However, once the babysitter took the victim out of her car seat and "love[d] on her[,]" the victim "stopped whining and crying all together." Ms. Dykes did not notice any marks or bruises on the victim. On cross-examination, Ms. Dykes affirmed that the victim typically did not "fuss" during car rides. On redirect examination, Ms. Dykes conceded that she did not know whether the victim had taken a nap, been fed, or had her diaper changed before Ms. Dykes arrived at the apartment.

Tara Nagel testified that she babysat the victim for approximately two hours on May 15, 2014. Ms. Nagel stated that the victim was "really whiney" that day. When the

Defendant arrived to take her home, the victim was asleep and "got upset when she was leaving" Ms. Nagel's house. Ms. Nagel affirmed that she had seen other babies "get fussy before when [she] w[o]ke [them] up[.]" Ms. Nagel did not observe any bruises on the victim. On cross-examination, Ms. Nagel conceded that although she did not see any bruises on the victim, she was fully-clothed during her time with Ms. Nagel. Ms. Nagel stated that she sent a text message to Ms. Denny while she was babysitting the victim to tell her that the victim was "really fussy[.]" Ms. Nagel explained that she "always said something" to parents if she noticed something different with their children.

Detective Ulrey's trial testimony largely reflected that of his suppression hearing testimony. Detective Ulrey reaffirmed that the Defendant had voluntarily given consent to search and process his apartment and voluntarily gone to the SOU office to speak with Detective Ulrey. The audio/video recording of Detective Ulrey's interview with the Defendant was published for the jury. During the interview, the Defendant explained that after returning home from the babysitter's house, he gave the victim a bath and noticed bruises on her spine. He sent a text message to his wife about the bruises. As he was trying to dry off the victim, she was "crying profusely" and "screaming." He then "gave her [his] phone to calm her down[,]" and she "thr[ew] it on the ground." As he picked up his phone from the floor, the victim "kick[ed] up" and "flip[ped] over" off the ottoman, hitting the side of the Defendant's head and "land[ing] perfectly" on a toy that was beside the ottoman. He grabbed her foot, but her head hit the wooden floor. The victim "got the wind knocked out of her" and "started crying." In response to the victim falling, the Defendant was "kind of mad" and "smacked [the victim] on her stomach" because he "told her to stay there[.]" The Defendant stated that he knew he "shouldn'ta [sic] freaked out . . . as bad as [he] did[.]" The Defendant "calmed her down" and put a diaper on the victim before putting her in her crib with a bottle.

The Defendant explained that ten or fifteen minutes later, he checked on the victim and saw that she was not sucking on the bottle but was gasping for air. When he returned from taking her bottle to the refrigerator, he saw she had vomit on her shirt. The Defendant picked her up from the crib, and her head started "to fall back a little bit" while she was "slowly blinking" and "look[ing] at the ceiling." The victim "was still throwing up" and then began "dry heaving," so the Defendant held her over the bathroom sink. The Defendant then "put her on the ground" and noticed she was breathing "really slow[,]" and "her heart slowly stopped beating." He then called Ms. Denny and then called 911, who instructed him how to perform CPR on the victim. During the interview, the Defendant affirmed that he "may have" hit the victim in the stomach "harder than what [he] thought [he] did[.]" He also told Detective Ulrey that he "may have hit her twice." The Defendant also admitted that he twice performed an "altered Heimlich maneuver" on the victim, which he described as "hold[ing] her against [his] body" and doing "a slight inward motion until when you can tell it hurts her, 'cuz she'll start

screaming." The Defendant stated that he "bruised her sternum" while performing CPR on the victim.

Later in the interview, the Defendant went on to expand on what had happened with the victim:

> I may have picked her up aggressively, you know, I probably did, because I was freaked out and I was mad that she – she you know, kick flipped like that, 'cuz she's never done that.
>
> . . . .
>
> [T]here was a couple [bruises] on . . . her spinal cord and there was . . . one . . . by her right butt cheek. . . . I probably gave her those bruises; there's no way – there's no way else. How – how can she fall like on her spinal cord like that? I have to have done that.
>
> . . . .
>
> I believe I harmed her. I believe that I freaked out in a certain way that I shouldn't have. I don't think . . . I don't think I helped the situation for her to still be alive today.

The Defendant then affirmed that he called 911 after calling Ms. Denny. Detective Ulrey asked, "Do you mind if I look in your phone?" and the Defendant responded, "You can." The Defendant then gave Detective Ulrey the passcode to unlock his cell phone. Detective Ulrey then left the interview room for approximately an hour and a half. When he returned to the room, Detective Ulrey said, "[Y]ou know that the actions that you took tonight were the direct cause of your child's death." The Defendant responded, "Yes, sir." The Defendant asked Detective Ulrey to tell his parents what was going on, stating that "[t]hey're gonna find – just tell 'em everything, sir." Detective Ulrey then allowed Ms. Denny into the interview room to see the Defendant. He told Ms. Denny, "I'm sorry. . . . You know I only wanted what would be best for us." After Ms. Denny and Detective Ulrey left the interview, the Defendant said aloud to himself, "Oh, f**k. What the f**k did I do?"

After the recorded interview was published to the jury, Detective Ulrey testified that the ottoman that the victim allegedly fell from was "approximately two-f[ee]t high." He stated that he did not find "any vomit, any . . . wet wipes[,] or any appearance of something having cleaned up vomit" in the victim's bathroom. He stated that the

- 12 -

Defendant was the only person present when the victim's fatal injuries occurred, and there were "no other suspects in this case."

On cross-examination, Detective Ulrey affirmed that previously in his career, he had received an evaluation that encouraged him to "remain aware of alternate theories in his cases." Detective Ulrey rejected defense counsel's assertion that he initially went to the Defendant's apartment to "investigat[e] a homicide." He explained that "[a]nytime somebody died in the city of Clarksville and they're out of the direct care of a doctor[,] then . . . my office is notified. . . . More times than not, a drastically different more times than not, they're not homicides." Detective Ulrey testified that it was standard practice to keep a "crime scene log" during investigations and to keep "consent to search forms" in his portfolio. On redirect examination, Detective Ulrey explained the evaluation that was brought up by defense counsel was written when he was "brand new to the homicide unit." He stated that "[i]f you actually sit down and review[] the entire document . . . it was a very good evaluation, and . . . [the lieutenant] kind of got to the point well, I need to put something down; what can he build on now that he's here in homicide?"

Dr. Adele Lewis testified as an expert in forensic pathology medicine. She stated that she had performed around 4,000 autopsies in her career, including "at least 100" child autopsies. Dr. Lewis performed the victim's autopsy, which revealed "multiple bruises on both sides of her head, the top and back of her head. [T]oo many to count." The victim also had a healing injury to the inside of her lower lip and some bleeding deep into her scalp, indicating that a significant amount of force had been applied to her head. Over defense counsel's objection, Dr. Lewis testified that based on her education and experience, the type of bruises observed on the victim "would raise some concern in [her] mind at the time of autopsy." During the autopsy, "the bruising to her head was so severe and there were so many of them" that Dr. Lewis had to shave the victim's hair in order to document all of her injures. Dr. Lewis stated that a person "wouldn't get all of these too many to count bruises from just a single fall from two feet. You probably wouldn't get any injury from that."

There were "at least eight separate areas" of deep bruising "all the way through [the victim's] scalp" that were sustained at or around the time of death, and Dr. Lewis reiterated that such injuries could only be consistent with falling from two feet if the victim "hit her head eight times all over the sides of her head" during the fall. Over defense counsel's objections, Dr. Lewis opined that she did not think "a child of this age [would] have either the strength or the coordination to inflict this kind of injury on herself." Dr. Lewis also noted fingerprint bruises on the victim's back that were "thought to be sustained when a person grasps a child very firmly" and were "suspicious for inflicted trauma." These fingerprint bruises were likewise sustained at or around the victim's time of death.

The victim had "a complex of bruises on the left side of her chest, near the middle" that was sustained at or around the time of death. Dr. Lewis further noted that the victim had "small round bruises over the right side of her chest" and "round or oval bruises" on both the right and left side of her abdomen. Dr. Lewis explained that "usually when a child is slapped very hard[,] you can really sort of see an outline of the hand or the fingers on them, and . . . I don't see that here." She elaborated that "it could be possible" that such bruising on the victim's abdomen resulted from being slapped, but "given the severity of the injuries that [she] saw inside of her, that would have to be a very hard slap to the abdomen[,]" and she would "expect to see a handprint." Dr. Lewis testified that she had "never seen a child sustain injuries like that from CPR" and opined with a "reasonable degree of medical certainty" that the 18-pound victim could not "exert enough force to do this to herself."

With respect to internal injuries, Dr. Lewis testified that the victim had bruising to the surfaces of both lungs; bleeding into the muscles between the ribs; multiple bruises on the small and large intestines; bruising on the diaphragm; bruising and injuries to the pancreas; bleeding in the abdomen; and her liver was almost cut in half. It would take "a great deal of force to cause an injury like that" to the liver, and her liver would have to be "pressed up against the spine and that's how it split" for a slap to be capable of causing such an injury. The victim's internal injuries were sustained around the time of her death and were not consistent with CPR. The injuries would have caused the victim to be "bleeding internally" and "have abdominal pain[.]" The victim's crying and vomiting were "consistent with the internal injuries" she sustained. Dr. Lewis opined that the victim "could have survived maybe a period of a few hours" after sustaining such injuries. There was a "remote chance" that the victim might have survived with immediate medical attention.

The victim's cause of death was multiple blunt force injures, and the injuries to her liver and pancreas "were the most severe and led to her death[.]" Dr. Lewis explained that in addition to the victim's liver being "nearly split in half," her injured pancreas was leaking digestive enzymes "into [her] abdomen and sort of start[ed] digesting itself." Abusive trauma was the "only medical disease or process that [Dr. Lewis] kn[e]w of that causes multiple bruises in multiple areas of the body and multiple injuries in the abdomen[.]" Neither an "event where [the victim] was gasping for air" nor the victim being "anemic at birth" would "have affected [Dr. Lewis'] determination in this autopsy at all," though anemia could have caused the victim to "die[] more quickly[.]" Dr. Lewis stated that the victim's manner of death was homicide. The victim falling two feet or being slapped in the abdomen would not be "a severe enough trauma" for the victim's death to be considered accidental.

On cross-examination, Dr. Lewis conceded that she did not recall whether the victim's previous "gasping for air" incident or possible anemia were relayed to her before the victim's autopsy. However, Dr. Lewis repeatedly emphasized that these details "would not have [a]ffected [her] determination of cause and manner of death." She agreed that she also did not think that the Defendant's "altered Heimlich maneuver" was relayed to her. Dr. Lewis also agreed that "a bleeding disorder" could cause "excessive bleeding," but she specified that such a disorder "would not result in the trauma" that the victim sustained, specifically the "demonstrable visible injuries to the pancreas, the lungs, the liver." She noted that she "take[s] everything into account when [she] make[s] these judgments at autopsy, and there were many injuries that could not possibly be explained by a bleeding disorder." Dr. Lewis affirmed that she did not find any broken or previously broken bones during the victim's autopsy.

`       On redirect examination, Dr. Lewis stated that falling onto a toy would not cause the victim's injuries unless she "had fallen from a two or three story building onto the toy." She agreed that "a punch with a fist" rather than a slap could have caused the injuries to the victim's abdomen, again noting that the small oval bruises were not in a "slap pattern," and the "blow had to be powerful enough to crush her liver and her pancreas against her spine." She testified that the knuckles from a closed fist could have caused the small oval bruises on the victim's abdomen. Dr. Lewis reaffirmed that the victim "could have lived a matter of hours" with the severe injury to her liver. She did not find "any evidence at all" that the victim had a bleeding disorder or clotting disorder and would have been "more willing to entertain the idea of an underlying unidentified blood disorder if there were no evidence of significant trauma to the internal organs." The victim's injuries were not consistent with the Defendant's performing "an altered Heimlich maneuver" on the victim, and her internal injuries were "more likely" caused by "a strike" than "squeezing." On recross-examination, Dr. Lewis explained that the victim did not sustain broken bones in relation to her abdominal injuries because "the fatal injuries were in the soft organs of the abdomen where you don't have bones in front."

## ANALYSIS

The Defendant argues on appeal that that the evidence is insufficient to support his aggravated child abuse conviction; the trial court erred in denying his motions to suppress his recorded interrogation statement and text messages in violation of his Fourth and Fifth Amendment rights; that the trial court erred in allowing Dr. Lewis to testify "about matters outside of her area of expertise"; that the trial court erred in not sentencing him as an especially mitigated offender; and that cumulative error entitles him to a new trial.[2]

---

[2] We have reordered the Defendant's arguments for the sake of clarity.

## I. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to sustain his aggravated child abuse conviction, specifically asserting that the evidence supported that he acted recklessly and therefore "does not support the mens rea required to convict" him. In support of this argument, he states that "testimony in this case established that [the victim] may have had a pre-existing bleeding disorder" and that the State "offered no explanation or motive" for the Defendant to kill the victim or "any evidence that there had ever been any sort of abuse in the past" of the victim by the Defendant. The State responds that the evidence is sufficient to sustain the aggravated child abuse conviction, citing, among other things, the testimony of Dr. Lewis that the injuries were non-accidental and noting that the State was not required to prove a motive. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a

convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

In relevant part, "[a] person commits the offense of aggravated child abuse . . . who commits the offense of child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). Generally, the offense is a Class B felony, but the offense is a Class A felony if the abused child is eight years of age or less. Id. § 39-15-402(b). A person commits a form of child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Id. § 39-15-401(a). A person acts "knowingly"

> with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Id. § 39-11-106(a)(20). Further,

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood

- 17 -

of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Id. § 39-15-402(d).

Viewed in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to find the Defendant guilty of aggravated child abuse beyond a reasonable doubt.  According to Dr. Lewis, the victim died from multiple blunt force injuries, with the injuries to her liver and pancreas being "the most severe and led to her death[.]"  The victim specifically had bruising to the surfaces of both lungs; bleeding into the muscles between the ribs; multiple bruises on the small and large intestines; bruising on the diaphragm; bruising and injuries to the pancreas; bleeding in the abdomen; and her liver was almost cut in half.  All of the victim's injuries occurred at or around the time of her death, during which the victim was in the sole care of the Defendant.  The Defendant asserts that the victim had "a pre-existing bleeding disorder" in support of his argument that he only acted recklessly, despite the fact that there was no actual evidence that the victim had such a disorder.  Although the Defendant does not cite to anything in the record to support his assertion that trial testimony "established that [the victim] may have had" such a disorder, we note that the victim's mother testified that although the victim was suspected of being anemic when she was a newborn, they had "her hematocrit under control" at the time of her death, and she was never diagnosed with anemia.  Further, Dr. Lewis stated that even if the victim did have anemia, it would not have affected her findings about the victim's death in any way and could not have caused her injuries, though it could have made her die more quickly from her injuries.  Dr. Lewis was adamant that the victim's injuries were non-accidental and were not consistent with the Defendant's explanation of events.

The Defendant also argues that he did not knowingly injure the victim and that the evidence does not support the requisite mens rea for an aggravated child abuse conviction.  He further asserts that evidence at trial "established that whatever happened to [the victim] on May 15, 2014[,] was an accident."  Such arguments are misplaced.  Relative to the required mental state, "child abuse is a 'nature-of-conduct' offense," and the State is not required to "prove that the defendant intended to cause injury to the child."  State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003) (internal quotation marks and citations omitted).  The defendant need not have known or intended that his conduct would inflict the resulting serious bodily injury.  Id.  The State is required to prove beyond a reasonable doubt that the Defendant knowingly treated the victim in an abusive manner and that the treatment resulted in serious bodily injury.  Tenn. Code Ann. § 39-11-106(a)(20).

The jury heard the Defendant make statements during his police interview, including "I probably gave her those bruises[,]" "I believe I harmed her. I believe I freaked out in a certain way that I shouldn't have[,]" and "I may have picked her up aggressively, you know, I probably did, because I was freaked out[,] and I was mad[.]" The Defendant also told Ms. Denny that he had "snapped on" the victim and "hit her stomach[.]" The jury saw photographs of the victim's injuries and heard Dr. Lewis' testimony about the nature of those injuries and her rejection of the idea that the victim had a bleeding disorder. It was also undisputed that the victim was in the sole care of the Defendant at the time of her injuries and death. Dr. Lewis stated multiple times during her testimony that the victim's injuries were completely inconsistent with the Defendant's version of events. Despite the Defendant's arguments to the contrary, it was reasonable for the jury to conclude that the Defendant knowingly inflicted the victim's extensive injuries other than by accidental means while the victim was in his sole care. See, e.g., State v. Hanson, 279 S.W.3d 265, 278 (Tenn. 2009).

Finally, although the Defendant argues that the State failed to prove his motive for killing the victim, the State was not required to do so. State v. Dequevion Lamar Lee, No. W2017-01449-CCA-R3-CD, 2018 WL 2277808, at *4 (Tenn. Crim. App. May 18, 2018) ("Motive is not an element of the crime; therefore, the State is not required to prove the defendant's motive for committing the crime."). We affirm the Defendant's conviction for aggravated child abuse.

## II. Motion to Suppress

As to this issue, the Defendant argues on appeal that he was unlawfully detained and that he did not waive his right to counsel. In reviewing this claim, we first note that as the evidence was presented in this matter, the Defendant's statement to police officers was largely exculpatory, meaning that it sought to explain how the victim sustained fatal injuries while alone with the Defendant. It appears that that the jury accredited at least part of the statement, for the Defendant was convicted of a lesser charge rather than the second degree murder for which he had been indicted.

The Defendant argues that the trial court erred in denying his motions to suppress his recorded statement to officers in violation of his rights under the Fourth Amendment and Fifth Amendments to the United States Constitution and article I, sections 7 and 9 of the Tennessee Constitution. Further, he asserts that his Fourth Amendment rights were violated by the trial court's denying the motion to suppress his text messages. More specifically, he argues that he was unlawfully detained by being placed in a locked room, and he argues that his statement was the fruit of this illegal detention, as was his consent for officers to search his cell phone. The State responds that the trial court correctly denied the motions to suppress as to the Defendant's statement because he had been

- 19 -

lawfully detained, and, as to the text messages, he had voluntarily consented to these being obtained by officers.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions as to the credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The factual findings made by the trial court at a motion to suppress hearing are binding on the appellate court unless the evidence preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999). In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

## A. Fourth Amendment Jurisprudence

Both the United States and Tennessee Constitutions protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. Art. I, § 7. A warrantless search or seizure is presumed unreasonable, and the "evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)). Exceptions to the warrant requirement include consent to search, search incident to a lawful arrest, evidence in plain view, searches and seizures conducted in "hot pursuit" of a fleeing criminal, a "stop and frisk" based on reasonable suspicion of criminal activity, and probable cause to search with exigent circumstances. State v. Bartram, 925 S.W.2d 227, 230 & n.2 (Tenn. 1992).

A seizure or detention occurs when, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" State v. Williams, 185 S.W.3d 311, 316 (Tenn. 2006) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). However, an arrest

> is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the

- 20 -

person arrested to the actual control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted). Handcuffing and placing a person in the back of a patrol car does not automatically transform a brief detention for investigative purposes into an arrest. See State v. Marvin Roscoe, No. W2013-01714-CCA-R9-CD, 2014 WL 3511041, at *6 (Tenn. Crim. App. July 11, 2014). However, a detention must not last longer than needed to effectuate the reason underlying the stop, with the officer "diligently pursu[ing] a means of investigation that [is] likely to confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998).

A warrant is not required for an investigatory stop "when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997); see also Terry v. Ohio, 392 U.S. 1, 21 (1968); State v. Binette, 33 S.W.3d, 215 218 (Tenn. 2000); Yeargan, 958 S.W.2d at 630. Reasonable suspicion is a lower standard of proof than probable cause but must be more than the officer's "inchoate and unparticularized suspicion or hunch.'" State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009) (quoting State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008)). Our supreme court has explained that reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218. Reasonable suspicion exists when "'specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. (quoting Terry, 392 U.S. at 21). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). In an investigative stop, an officer's actions "must be 'reasonably related in scope to the circumstances which justified the interference in the first place,'" State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting Terry, 392 U.S. at 20, 88), and "the detention 'must be temporary and last no longer than necessary to effectuate the purpose of the stop[.]'" Troxell, 78 S.W.3d at 871 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

Whether a person voluntarily consents to a search is a question of fact that is to be determined from the totality of the circumstances. State v. Berrios, 235 S.W.3d 99, 109 (Tenn. 2007). In order for consent to be voluntary, it must be "unequivocal, specific,

intelligently given, and uncontaminated by duress or coercion." Id. (quoting Simpson, 968 S.W.2d at 784) (internal quotation marks omitted). "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973). When determining the voluntariness of consent, factors to consider include: (1) "[t]ime and place of the encounter"; (2) "[w]hether the encounter was in a public or secluded place"; (3) "[t]he number of officers present"; (4) "[t]he degree of hostility"; (5) "[w]hether weapons were displayed"; (6) "[w]hether consent was requested"; and (7) "[w]hether the individual initiated contact with the police." Id. (citation omitted).

Additionally, "a consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality." State v. Garcia, 123 S.W.3d 335, 346 (Tenn. 2003) (citing Wayne LaFave, 3 Search and Seizure § 8.2(d) at 656 (3d ed. 1996)). To determine whether the prior illegality was sufficiently attenuated from consent to search, courts look to the following factors: (1) "the temporal proximity of the illegal seizure and consent"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." Id. (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). Attenuation issues are highly factual, and the burden of proving attenuation lies with the State. Id.

The Defendant asserts that being transported to the police station in a patrol car was an unlawful detention, and his statement to Detective Ulrey and his consent to search his phone should therefore have been suppressed by the trial court. Following the evidentiary hearing on the Defendant's motions to suppress his statement to Detective Ulrey and text messages, the trial court entered an order denying the Defendant's argument that he had been unlawfully detained in the police vehicle. The court noted that the Defendant was "unable to drive himself, a result of his emotional state." While the trial court concluded that transporting the Defendant in the backset of the police vehicle amounted to an investigatory detention, the court noted that the Defendant had been the only person in the apartment, other than the victim, when she sustained a fatal injury. Accordingly, the court concluded that "it seems appropriate that there be a brief investigatory detention, which would be supported by reasonable suspicion." Further, the court found that, even if the detention were not justified, "the taint of the unlawful seizure had been sufficiently attenuated from the subsequent voluntary consent of the Defendant."

We agree with the trial court that an investigatory detention of the Defendant was warranted in the instant case. When police arrived at the Defendant's apartment, they only knew that the one-year-old victim had been badly injured while in the Defendant's

care and had subsequently died. A detective was sent to the hospital to learn more about the victim's injuries. While the Defendant was still at his apartment with police, police heard him make phone calls to his mother-in-law to say "I'm so sorry," and to Ms. Denny to say that he had "failed her." The Defendant appeared upset at the apartment; police witnessed him vomiting, pulling a towel rack from the wall, and yelling profanities to the extent that they worried about him potentially harming himself. As we explained above, reasonable suspicion exists when "'specific and articulable facts . . . taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Binette, 33 S.W.3d at 218 (quoting Terry, 392 U.S. at 21). Objectively, under the totality of the circumstances, the observations made by police at the crime scene undoubtedly equated reasonable suspicion and warranted an investigatory detention of the Defendant to determine what had happened to the victim while she was in the Defendant's sole care.[3]

With respect to Detective Ulrey's decision to conduct the investigation at the police station rather than the crime scene, Detective Ulrey testified that he chose to do so because a police team was processing the Defendant's apartment following the Defendant's consent to do so, and the police station had audio and video recording capabilities, unlike the crime scene. As noted by the State, defendants have contended that a lack of video and audio recording of their statements warranted their suppression. See, e.g., State v. Godsey, 60 S.W.3d 759, 771 (Tenn. 2001). Further, the record reflects that the Defendant showed no hesitation in accompanying Detective Ulrey to the police station after Detective Ulrey asked to speak with him. Though he was transported in the backseat of a patrol car because there were two loaded weapons stored in the front seat, the Defendant was not handcuffed inside of the car pursuant to Detective Ulrey's instructions and was driven by a single officer, Officer Bing. Though Officer Bing collected the Defendant's wallet, phone, and vaporizer and kept them in the front seat, he testified that this was his standard protocol and not because the Defendant was under arrest. Upon arriving at the police station, the Defendant remained unrestrained both during the walk into the station and while in the interview room. Officer Bing remained at the SOU in order to give the Defendant a ride home. The Defendant did not ask to leave the interview, and nothing prevented him from doing so if he wished. The Defendant was given a restroom break and offered refreshment. Nothing in the record suggests that Detective Ulrey or any other officer was coercive or threatening at any point while interacting with the Defendant. The Defendant was even allowed to see and speak with Ms. Denny. Finally, there is likewise nothing in the record to suggest that police

---

[3] We note that although Detective Ulrey testified that he did not believe he had reasonable suspicion to detain the Defendant at his apartment, the test for whether reasonable suspicion exists is objective, rather than subjective, as stated above. See Norwood, 938 S.W.2d at 25 (noting that the "specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop.").

- 23 -

prolonged the investigatory detention of the Defendant or that they did not diligently pursue the means of investigation that would be able to dispel their suspicions as quickly as possible; a detective went to the hospital to learn about the victim's injuries, and the Defendant was the only other person who could explain to police what had occurred in the apartment. The trial court did not abuse its discretion in concluding that an investigatory detention of the Defendant was justified and therefore denying his motions to suppress.

Even if the Defendant's detention were illegal, despite his arguments, his statement to Detective Ulrey and his consent to search his cell phone were not "fruits of the poisonous tree." In analyzing the aforementioned Brown factors, the record does not reflect any police misconduct whatsoever. Though the Defendant's statement and consent to search his phone were given shortly after his detention, he voluntarily waived his Miranda rights and desired to speak with Detective Ulrey, which he reiterated during the interview, though Detective Ulrey told him that if he wanted to consult counsel, the interview would end. Detective Ulrey was the only officer present during the interview. The Defendant also gave Detective Ulrey the password to his cell phone so that he could look through it.[4] See Brown, 422 U.S. at 603-04. We agree with the trial court that even if the Defendant's detention were illegal, his consent to search and his statement to Detective Ulrey were sufficiently attenuated from the detention that they were not fruit of the poisonous tree. The Defendant is not entitled to relief.

## B. Fifth Amendment Jurisprudence

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently" to be valid. Id. at 475. The State has the burden of showing voluntariness by a preponderance of the evidence. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). The totality of the circumstances surrounding the interrogation must reveal both an

---

[4] We note that the record also reflects that Ms. Denny had copies of the text messages obtained by Detective Ulrey on her cell phone, which she allowed police to view.

uncoerced choice and the required level of comprehension. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). Certain factors apply in the determination of whether a waiver of Miranda rights qualifies as voluntary, knowing, and intelligent: the age and background of a defendant; their education and intelligence level; their reading and writing skills; their demeanor and responsiveness to questions; their prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the Miranda rights were explained. State v. Echols, 382 S.W.3d 266, 280-81 (Tenn. 2012) (citing State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000); State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998)).

"When a suspect invokes the right to counsel, police must cease questioning until counsel is present" or the suspect initiates further conversation with the police. State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003) (citing Miranda, 384 U.S. at 444-45; Edwards v. Arizona, 451 U.S. 477 (1981); State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994)). However, an invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, 459 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)). In other words, the suspect's request for an attorney must be stated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," questioning need not cease nor must an officer clarify the suspect's intention regarding invocation of the right to counsel. Id. Once the suspect invokes his right to counsel, any later statement made by a defendant as a consequence of interrogation by police must be suppressed. Edwards, 451 U.S. at 487. On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda, 384 U.S. at 478. "'Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'" Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (quoting United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985)).

The issue of whether a suspect's request for an attorney was unequivocal is a mixed question of law and fact that is subject to de novo review. State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (citing State v. Turner, 305 S.W.3d 508, 514-15 (Tenn. 2010)). In Davis, the Supreme Court stated that, although it is a good policy for law enforcement to clarify whether a suspect has actually asked for an attorney when the suspect's request is ambiguous, it "decline[d] to adopt a rule requiring officers to ask clarifying questions." Davis, 512 U.S. at 461. The Court explained, "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no

- 25 -

obligation to stop questioning him." Id. at 461-62. Accord Saylor, 117 S.W.3d at 246 ("The standard for a valid invocation of the right to counsel is the same under both [a]rticle I, [s]ection 9 [of the Tennessee Constitution] and the Fifth Amendment.").

Our supreme court previously explained, "[W]hen determining whether a suspect has invoked the right to counsel . . . , Tennessee courts must apply the Davis standard, regardless of the timing of the suspect's alleged invocation of the right. The pre-[Miranda] waiver/post-[Miranda]waiver distinction drawn in Turner has been abrogated by Berghuis [v. Thompkins, 560 U.S. 370 (2010)]." Id. at 562 (footnote omitted). Our supreme court went on to hold that the Climer defendant's questions to detectives, like "You mean I can have an uh an uh appointed lawyer right now?" were not an unequivocal invocation of the right to counsel and noted that such statements were similar to those in other cases that were decidedly ambiguous:

> Defendant's statements are also very similar to other statements the Court of Criminal Appeals has found to be equivocal or ambiguous. See, e.g., State v. Bell, No. E2008-01499-CCA-R3-CD, 2010 WL 3612751, at *24 (Tenn. Crim. App. Sept. 17, 2010) ("I think I need to talk to a lawyer."); State v. Mitchell, 137 S.W.3d 630, 636-37 (Tenn. Crim. App. 2003) ("Do you think I need a lawyer?"); State v. Sanders, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *8 (Tenn. Crim. App. Dec. 6, 2006) ("I guess I need a lawyer, don't I?"); State v. Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 (Tenn. Crim. App. Aug. 28, 2000) ("Don't I need to talk to a lawyer?"); State v. Young, No. 01C01-9605-CC-00208, 1998 WL 258466, at *12 (Tenn. Crim. App. May 22, 1998) ("I'm sorry, I'm just wondering if I should have a lawyer."); State v. Ake, No. 01C01-9603-CC-00094, 1997 WL 311908, at *2 (Tenn. Crim. App. June 6, 1997) ("I probably need to get a lawyer, don't I?").
>
> Defendant's equivocal statements, like those in the decisions cited above, communicated merely a *potential* desire to consult with counsel and lacked the clarity and definitiveness characteristic of statements deemed unequivocal invocations of the right to counsel. See, e.g., Edwards, 451 U.S. at 479, 101 S.Ct. 1880 ("I want an attorney before making a deal."); Turner, 305 S.W.3d at 522 ("Get me a lawyer."); State v. Koffman, 207 S.W.3d 309, 319 (Tenn. Crim. App. 2006) ("I want to call [a judge] and [a federal public defender]."); State v. McCormick, No. E2003-02689-CCA-R9-DD, 2004 WL 2583903, at *11 (Tenn. Crim. App. Nov. 15, 2004) ("I'd be willing to [cooperate], I'd like to have a lawyer at this point."); State v. Tidwell, 775 S.W.2d 379, 387 (Tenn. Crim. App. 1989) ("I'd like to call a lawyer before I discuss that.").

Climer, 400 S.W.3d at 563-64.

First, we note that the proof was that the Defendant was alone with the victim when she sustained the injuries resulting in her death and that his statement to police officers as to how she sustained these injuries was largely exculpatory. In denying the Defendant's motions to suppress, the trial court found that the Defendant had voluntarily signed the Miranda warning, which served "as a knowing waiver of the Defendant's right to counsel for purposes of the interview." As we will explain, we agree with this determination by the trial court.

As we have laid out, the following exchange occurred between Detective Ulrey and the Defendant during his interview:

[The Defendant]: . . . [i]s there anyway way I could—'cuz my—my dad's, uh, girlfriend is a lawyer; is there any way I—I'd be able to talk to her first?

Detective Ulrey: Before you talk to me at all?

[The Defendant]: . . . [A]bout anything.

Detective Ulrey: . . . [If] you are asking to talk to an attorney, that is absolutely shutting me down.

[The Defendant]: Okay. Then no—

Detective Ulrey: That—

[The Defendant]: No.

Detective Ulrey: . . . I'm just—I want you to understand I'm trying to figure out what happened.

[The Defendant]: Okay.

Detective Ulrey: If you are telling me that you want to talk—you—you understand your rights; if you're telling me you wanna [sic] talk to an attorney before you talk to me, then I can't talk to you anymore.

[The Defendant]: Okay.

- 27 -

Detective Ulrey: Okay. Um . . .

[The Defendant]: I don't have any problem—

Detective Ulrey: But it—

[The Defendant]: I don't have a problem with you talking to me.

Detective Ulrey: Okay. All right.

[The Defendant]: I don't.

Detective Ulrey testified that after the Defendant mentioned a lawyer, he did not believe that the Defendant was unambiguously invoking his right to have an attorney present. Detective Ulrey thus asked qualifying questions to determine if the Defendant actually wanted to speak to an attorney, which Detective Ulrey was not required to do. See Davis, 512 U.S. at 461 (declining to adopt a rule requiring police officers to ask qualifying questions following an ambiguous reference to an attorney but stating that it was good policy for police officers to do as such). Once the Defendant understood that Detective Ulrey could not continue to speak to him if he was in fact asking for a lawyer, the Defendant very clearly responded that he did not "have a problem with [Detective Ulrey] talking to [him]," and reiterated his desire to speak with Detective Ulrey by again stating, "I don't." Like the defendant in Climer, we agree with the trial court that the Defendant did not make an unequivocal request for an attorney. Instead, his question regarding his father's girlfriend, who was an attorney, "communicated merely a *potential* desire to consult with counsel and lacked the clarity and definitiveness characteristic of statements deemed unequivocal invocations of the right to counsel." Climer, 400 S.W.3d at 564. Because there was never an unequivocal invocation by the Defendant of his right to counsel, Detective Ulrey was under no obligation to end the interview immediately. In fact, Detective Ulrey sought to clarify exactly what the Defendant meant by such a statement, which he was not required to do. In response, the Defendant repeatedly relayed his desire to speak with Detective Ulrey. Therefore, the Defendant's statement was not elicited in violation of his right to counsel.

With respect to the Defendant's Miranda waiver, the record reflects that the Defendant was 21 years old at the time of the victim's death and had graduated from high school and attended some community college. He had served in the United States Army and seemed to have no trouble communicating with Detective Ulrey. He spoke intelligently and was able to recall and give details about his life to Detective Ulrey. Detective Ulrey read the Defendant a clearly-worded Miranda warning and waiver, which the Defendant signed after reiterating that he wanted to speak to Detective Ulrey.

- 28 -

Though the Defendant argues that he was "crying hysterically, vomiting, and hyperventilating" at home and therefore incapable of waiving his <u>Miranda</u> rights, the recorded interview does not suggest that he was under distress while speaking with Detective Ulrey. He was offered restroom breaks and water and was allowed to speak to Ms. Denny inside the interview room. Nothing in the record suggests that the Defendant was coerced into signing the <u>Miranda</u> waiver. Further, although the Defendant inferentially argues that because Detective Ulrey did not inform him that he was "engaged in trained interrogation tactics to try to obtain a confession[,]" the Defendant's <u>Miranda</u> waiver was not knowingly, voluntarily, and intelligently given, the Supreme Court has held that the Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." <u>Colorado v. Spring</u>, 479 U.S. 564, 576-77 (1987); <u>see also</u> <u>State v. Ronallen Hardy</u>, No. M2008-00381-CCA-R3-CD, 2009 WL 2733821, at *8 (Tenn. Crim. App. Aug. 31, 2009) (noting that detective's failure to "explicitly inform the appellant that he would be questioned" about murder and robbery did not affect his decision to waive his <u>Miranda </u>rights). Despite the Defendant's arguments to the contrary, Detective Ulrey was not required to tell the Defendant about interrogation tactics or even that he would be questioned about the victim's death. The Defendant reviewed and signed the <u>Miranda </u>waiver after reviewing it with Detective Ulrey. He never invoked his right to remain silent or unambiguously invoked his right to an attorney. In fact, he repeatedly communicated to Detective Ulrey that he wanted to continue speaking with him. Nothing in the recorded interview suggests any police coercion. Therefore, we agree with the trial court that the Defendant gave a knowing, voluntary waiver of his <u>Miranda</u> rights. The trial court did not abuse its discretion, and the Defendant is not entitled to relief.

### III. Opinion Testimony of Dr. Adele Lewis

Dr. Lewis, who performed the victim's autopsy, testified as an expert in forensic pathology. The Defendant argues that the trial court allowed her to testify as to matters outside her expertise, specifically that the bruises on the victim's body were not medically consistent with normal injuries for a one-year-old child, the force required to cause such injuries, and whether the victim's injuries could have been caused by the Defendant's performing CPR. The State responds that the testimony of Dr. Lewis in these issues was well within her area of expertise. We agree with the State.

The admissibility of expert testimony is governed by Rule 702 of the Tennessee Rules of Evidence. "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Our

supreme court has further defined the role of the trial court in assessing the propriety of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

State v. Scott, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted).

Rule 703 of the Tennessee Rule of Evidence provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Trial courts are vested with broad discretion in resolving questions regarding the admissibility of expert testimony. State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. Scott, 275 S.W.3d at 404. A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)). At trial, the burden rests on the party proffering the expert witness to establish that the evidence "rests upon 'good grounds.'" Scott, 275 S.W.3d at 404.

The Defendant specifically asserts that Dr. Lewis should not have been allowed to opine that the victim's injuries were inconsistent with her simply being a one-year-old child; that Dr. Lewis should not have been allowed to testify that the victim could not

have not have inflicted these injuries upon herself; and that the trial court erred in allowing Dr. Lewis to testify regarding the amount of force necessary to split the victim's liver. The State responds that Dr. Lewis was more than qualified to give such testimony, given her education, training, and experience as a forensic pathologist.

As to the Defendant's assertion that "[b]y her own testimony, Dr. Lewis was not qualified to testify as an expert" regarding the "medical consistency of bruises on a twelve-month-old child," he argues that she did not testify as to the ages of children or the causes of death as to her "[a]t least 100" autopsies on children or why she was an expert on what was normal bruising for a child of that age. In response to the Defendant's objection to the testimony at trial, the trial court stated that such an objection spoke to the weight to be given to Dr. Lewis' testimony, not its admissibility, and that the Defendant could cross-examine Dr. Lewis about such details. The Defendant chose not to cross-examine Dr. Lewis with such questions. In fact, as noted by the State, Dr. Lewis testified without objection on cross-examination that the victim's injuries were not located in "the usual places where children accidentally get injured. Children fall down and they get bruises on their knees, or their shins, or their elbows, and she did not have those." The trial court is given broad discretion in resolving questions concerning the admissibility of expert testimony, and we will not overturn its ruling absent a finding that it abused its discretion. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). We agree that the specific details about the child autopsies Dr. Lewis had performed during her career spoke to the weight, rather than admissibility, of her testimony. The Defendant chose not to ask Dr. Lewis for such details, despite his objection on appeal to the lack of such details. In light of Dr. Lewis' training and experience as a forensic pathologist, including her performance of "[a]t least 100" child autopsies, we conclude that the trial court did not abuse its discretion in allowing her to testify regarding the victim's bruising with respect to her age.

The Defendant also asserts that the trial court erred in allowing Dr. Lewis to testify that the victim would not have had the strength to inflict her injuries upon herself. However, as noted by the State, medical experts "routinely offer testimony ruling out possibilities for who had the physical ability to cause a victim's injuries." See, e.g., State v. Tyrail Jermaine Cooke, No. E2017-00781-CCA-R3-CD, 2018 WL 3532126, at *2 (Tenn. Crim. App. July 23, 2018) ("Doctor Perales testified that she could fathom no scenario under which the [five-year-old] victim could have caused the injuries to himself[.]"), perm. app. denied (Tenn. Dec. 5, 2018); State v. Savannah Humphrey, No. M2016-02183-CCA-R3-CD, 2017 WL4158692, at *6 (Tenn. Crim. App. Sept. 19, 2017) ("Dr. Brown testified that a child under four years of age would not be able to create the force necessary to inflict the array of injuries sustained by the victim[.]" ), perm. app. denied (Tenn. Jan. 18, 2018); State v. Demarkus Montreal Taylor, No. M2016-00255-CCA-R3-CD, 2017 WL 781733, at *4 (Tenn. Crim. App. Feb. 28, 2017) ("Dr. Lewis

claimed that a four-year-old would not have the necessary strength to inflict such injuries herself."), perm. app. denied (Tenn. May 18, 2017). The trial court did not abuse its discretion in permitting Dr. Lewis to testify that the "a child of this age" would not "have either the strength or the coordination to inflict this kind of injury on herself." Dr. Lewis' experience included at least 100 child autopsies, and she was undoubtedly qualified to opine that a one-year-old child was not capable of causing injuries that would split her own liver almost in half.

The Defendant finally argues that Dr. Lewis was permitted to "testify over objection and give expert opinion in the field of physics that the amount of force necessary to cause" the victim's liver to be almost split in half, which was "far outside of her area of expertise." The Defendant further asserts that by allowing such testimony, the trial court "completely failed in its obligation as the gatekeeper to relevant and reliable scientific testimony" and "violated [the Defendant]'s right to a fair trial[.]" As noted by the State, Dr. Lewis was not attempting to testify as a physicist or to quantify the exact mathematical force needed to cause such an injury. We agree with the Defendant that Dr. Lewis would not be qualified to testify about the exact physics and numerical forces needed to cause a liver to split. However, Dr. Lewis' testimony was undoubtedly relevant regarding whether the victim's injuries were consistent with an accident. Given the Defendant's defense theory that the victim's injuries resulted from a two-foot fall from an ottoman, Dr. Lewis' testimony was extremely relevant. See Tenn. R. Evid. 401. Regarding the reliability of Dr. Lewis' testimony, Dr. Lewis testified that she had performed 4,000 autopsies in her career at the time of trial. Dr. Lewis was therefore familiar with various injuries and what potentially could or could not have caused them.

Further, despite the Defendant's assertions to the contrary, this is the kind of mechanism of injury testimony that medical experts, including forensic pathologists, routinely offer without objection. See, e.g., Tyral Jermaine Cooke, 2018 WL 3532126, at *2 ("Doctor Perales testified that . . . the force required for the [five-year-old victim's] injuries would be similar to 'a car accident, forces equal to falling from a great height like skydiving; a lot of force.'"); Savannah Humphrey, 2017 WL 4158692, at *6 ("Dr. Brown testified that . . . aside from a 'horrible car accident,' there was no explanation for the [four-year-old] victim's injuries consistent with an accident.") (footnote omitted); State v. Rawney Jean Taylor, No. M2015-02142-CCA-R3-CD, 2017 WL 2179952, at *5 (Tenn. Crim. App. May 16, 2017) ("Dr. Lewis also said the [four-year-old] victim's head injuries were '[what] I would expect to see in someone who has been in a major car crash or who had fallen two or three stories out of a building.'"), perm. app. denied (Tenn. Sept. 21, 2017); State v. Sherry Dewitt, No. M2015-00816-CCA-R3-CD, 2016 WL 6638857, at *4 (Tenn. Crim. App. Nov. 10, 2016) (noting that Dr. Lowen testified that three-month-old victim's two-and-a-half-year-old brother could not have caused victim's injures "in the course of typical childhood play" or even had the strength to inflict the

victim's injuries and noted that injuries could not have been caused by an accidental mechanism "except for in maybe a major car accident with an unrestrained baby who maybe had multiple blows during a car accident."); State v. Randall T. Beaty, No. M2014-00130-CCA-R3-CD, 2016 WL 6600148, at *26 (Tenn. Crim. App. Nov. 8, 2016) (noting that Dr. Eutenier, who performed the nine-month-old victim's autopsy, testified that "the victim's injuries were consistent with a fall from a third floor window[.]"), perm. app. denied (Tenn. Mar. 9, 2017); State v. David William Lowery, No. E2015-00924-CCA-R3-CD, 2016 WL 1253642, at *6 (Tenn. Crim. App. Mar. 30, 2016) ("[Dr. Perales] stated that this fracture required a lot of force and was typically seen in things like car wrecks or motorcycle or airplane accidents."), perm. app. denied (Tenn. Aug. 18, 2016); State v. Joshua R. Starner and Caitlyn Metz, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *7 (Tenn. Crim. App. Apr. 20, 2016) ("Dr. Lewis noted that it would take a 'significant' amount of force to cause the [23-month-old] victim's injuries, force equivalent to a 'major car wreck' or a 'two or three story fall.'"), perm. app. denied (Tenn. Aug. 18, 2016). The trial court also instructed the jury that it was to decide whether Dr. Lewis' opinions "were based on sound reasons, judgment, and information" and the "weight and value" to be afforded to her testimony.

Ultimately, the jury heard testimony regarding Dr. Lewis' qualifications, and the trial court appropriately instructed that it was in the discretion of the jury as to the weight and credibility to assign to her expert testimony. See State v. Ayers, 200 S.W.3d 618, 223 (Tenn. Crim. App. 2005) (reiterating that the weight to be given expert testimony is a question for the jury under careful instruction of the trial court). We therefore discern no error regarding Dr. Lewis' qualifications or the opinions she provided at trial. The Defendant is not entitled to relief.

## IV. Sentencing

The Defendant argues that he should have been sentenced as an especially mitigated offender, specifically asserting that the trial court erred in "finding that only one mitigating factor" but "several enhancement factors" applied in this case. The State responds that the trial court's finding several applicable enhancement factors precludes sentencing as an especially mitigated offender and that such a classification is nevertheless within the trial court's discretion. We agree with the State.

Under the 2005 amendments to the Sentencing Act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701. Moreover, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

When a defendant has no prior felony convictions and the trial court finds mitigating but no enhancement factors, it "may" sentence the defendant as an especially mitigated offender. Tenn. Code Ann. § 40-35-109(a)(1), (2). Sentencing a defendant as an especially mitigated offender allows the court to reduce the Range I minimum sentence by ten percent, to reduce the release eligibility date to twenty percent, or both. Tenn. Code Ann. § 40-35-109(b). The trial court's decision to sentence an offender as an especially mitigated offender is discretionary. Tenn. Code Ann. § 40-35-109, Sentencing Comm'n Cmt; see State v. Braden, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993).

- 34 -

Following a sentencing hearing, the trial court found one mitigating factor and three enhancement factors to be applicable. In deciding to classify the Defendant as a Range I, standard offender, the trial court examined the applicable mitigating and enhancement factors as follows:

Pursuant to TCA section 40-35-113 the Court is to consider mitigating factors. And the Defendant has submitted and argued a list of mitigating factors. In looking at the statute the Defendant cites under TCA 40-35-114, under subsection 11, that the Defendant although guilty of the crime com[m]itted the offense under such unusual circumstances that it is unlikely that a sustained intent to violent the law motivated criminal conduct.

I find that this factor does not apply. The testimony at trial indicated that there was at times frustration. And while sustained intent is not necessarily defined there was -- this involved an intentional act. The autopsy report reflected various bruises on the child's body, which would indicate[] that this, perhaps, was not the first time that an incident like this occurred. Therefore, the Court finds that mitigating factor 11 does not apply.

Defense next cites as the -- under the, what's referred to as the catchall provision under 13, [the Defendant] tried to save [the victim]'s life. The indication is that [the victim's] life was gone by the time he commenced the efforts at CPR.

Under subsection ten the Defense presents the Defendant assisted the authorities locating or recovering any property or person involved in any -- the crime. I do not find that his mere sitting for an extended interview that was videoed, that the story changed as we went through it, was necessarily of assistance to the authorities, therefore, I do find that subsection ten applies.

Military service . . . as under the catchall. The presentence report, which we do not have the discharge papers from [the Defendant], but by his own statement he received a discharge under general conditions, which is less than an honorable discharge. His letters indicate that he was unable to find a -- had difficulty finding his place, and he -- one of the letters made reference to the fact that he stated that he could not get in the Navy or some other branch of service and he got in the Army. So I'm not going to -- the

Court finds that his effort at reliance upon military service does not serve as a mitigating factor.

The Defense cites to lack of criminal history, and that is correct. And I find that his lack of criminal history does qualify under [code section 40-35-113] subsection 13 as a mitigating factor.

Community involvement. His community involvement, apparently, ceased upon his leaving high school. And I find that that does not apply.

I understand the testimony and concern expressed by his parents, which is understandable, but I do not find that to be a mitigating factor.

Subsection -- under subsection six, the Defendant, because of youth or old age lacked substantial judgement in committing the offense. I recognize, and the letters submitted on behalf of [the Defendant] reflects, that he perhaps reads at a middle school level; nevertheless, he was able to function, he graduated from high school, he was inducted in the United States Army. The presentence report reflects that he obtained the rank of E3. So I do not find that he lacks substantial judgment, and even though he was 21-years of old [sic], there's a lot of parents at that age and, therefore, I do not find that subsection six applies.

I'm not going to apply the potential for rehabilitation, nor the remorse. Therefore, there is -- Court finds one mitigating factor under subsection 13, his lack of criminal history.

As [it] relates to the enhancement factors, this relates also as to whether [the Defendant] is to be an especially mitigated offender. He cannot have any enhancement factors. Enhancement factors are listed under TCA 45-35-114. Subsection four: A victim of the offense was particularly vulnerable because of age or physical or mental disability. [Defense counsel] is correct, it's got to be a factor that's not involved as part of one of the elements of the offense for which the Defendant is convicted, in this instance, aggravated child abuse, but under aggravated child abuse: This child under the age of eight. The Court finds a distinction between a child that's age one and age eight. That the case law is such -- or in this instance a one-year-old does not have the same options as a five-year-old, six-years-old on up to eight-year-old of being an effort of trying to run away, trying to escape or trying to scream; therefore, I find that in

this instance [the victim], by virtue of being a one-year-old, was particularly venerable because of her age.

Subsection five: That the Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. Medical proof in this case indicated that the victim's liver had been split, there was significant damage or injury to internal organs, therefore I find that subsection five applies.

Subsection 14: That the Defendant abused a position of public or private trust, used a professional license in a manner that significantly facilitated the commission or fulfilment of the offense. Under the case cited by the State[, State v. Kissinger, 922 S.W.2d 482 (Tenn. 1996),] it is correct that stepparent is a position a public trust, but there also has to be a relationship between that position, for lack of better description, the opportunity afforded to the accused, or in this instance, the accused -- or the convicted, for the perpetration of the offense.

As a stepparent he exercised his position to place himself of being a caretaker for this child that would not have occurred had he not been a stepparent who wanted to be the new adopted father for this child; therefore, I -- the Court finds that subsection 14 applies.

We initially note, as previously laid out, that the trial court's decision to sentence an offender as an especially mitigated offender is discretionary. Tenn. Code Ann. § 40-35-109, Sentencing Comm'n Cmt; see Braden, 867 S.W.2d at 762. Therefore, regardless of whether the trial court did or did not misapply any of the discussed enhancement or mitigating factors, it was within the trial court's discretion not to sentence the Defendant as an especially mitigated offender, even if he were eligible. See, e.g., State v. Thomas Fancher Greenwood, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *41 (Tenn. Crim. App. Nov. 21, 2014), perm. app. denied (Tenn. Apr. 10, 2015) (explaining that even though defendant was eligible to be sentenced as an especially mitigated offender, "no authority mandates this classification; to the contrary, this decision is discretionary with the trial court."). However, we find each of the enhancement factors discussed by the trial court to be applicable.

With respect to enhancement factor four, that a victim of the offense was particularly vulnerable because of age, the Defendant argues that "[t]he record does not support the [t]rial [c]ourt's finding that [the victim's age] had anything to do with her death." This court has stated that "merely establishing the youth of the victim at the time of the crime's perpetration is an insufficient basis for applying this fourth enhancement

factor" and that "[t]here must be evidence, in addition to the victim's age, to warrant application of this . . . factor." State v. Mark Summers, No. 03C01-9606-CR-00235, 1997 WL 785677, at *5 (Tenn. Crim. App. Dec. 4, 1997), perm. app. denied (Tenn. Sept. 21, 1998). For example, the trial court should consider whether the evidence in the record demonstrates that due to the victim's age, the victim was unable to resist the crime, summon help, or testify at a later date. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). The State is required to proffer evidence in addition to the victim's age to establish particular vulnerability; however, that evidence "need not be extensive." Id. at 97. Also, a court may consider the natural vulnerabilities attendant to the extreme ends of the aging spectrum by giving "additional weight . . . to the age of the victim in those cases where a victim is extremely young or old." Id. In the instant case, the trial court specifically stated that "in this instance[,] a one-year-old does not have the same options . . . of trying to run away, trying to escape or trying to scream[.]" The record reflects that the victim suffered extensive injuries while in the sole care of the Defendant at their apartment, and as noted by the trial court, was unable to escape or seek out help because she was a one-year-old child who could not yet walk or talk. We affirm the application of this factor.

With respect to enhancement factor five, exceptional cruelty, this court upheld the application of this factor in State v. Hodges, 7 S.W.3d 609, 631 (Tenn. Crim. App. 1998), an aggravated child abuse case. The Hodges court relied upon our supreme court's conclusion that "the element of 'serious bodily injury,' as included in the offense of especially aggravated robbery, does not necessarily constitute 'exceptional cruelty.'" Id. (quoting Poole, 945 S.W.2d at 98). This enhancement factor requires a finding of cruelty over and above that inherently attendant to the crime. See State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001); see also State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995) (citation omitted) (holding that this factor was not applicable because there was no evidence that rape victim suffered greater injury than that ordinarily involved in the offense), overruled on other grounds by State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). The Poole court explained that "the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the charged offense. 945 S.W.2d at 98. In applying this factor, the trial court should state what actions, apart from the elements of the offense, constitute "exceptional cruelty." State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995).

In the instant case, the victim had bruising to the surfaces of both lungs; bleeding into the muscles between the ribs; multiple bruises on the small and large intestines; bruising on the diaphragm; bruising and injuries to the pancreas; bleeding in the abdomen; and her liver was almost cut in half. The Defendant also did not immediately call 911 when he noticed that the victim was having trouble breathing. Instead, he took

the time to place the bottle he had given her back inside the refrigerator and hold her over the sink while she was dry-heaving. He then called Ms. Denny, who encouraged him to call 911. See, e.g., State v. Eric Cathey, No. 2008-01446-CCA-R3-CD, 2010 WL 2836632, at *20 (Tenn. Crim. App. July 20, 2010) (stating that enhancement factor five applied where defendant noticed the victim was having trouble breathing and did not immediately call 911, and victim had extensive injuries). In contemplating whether enhancement factor five was applicable, the trial court specifically noted that the victim's liver had nearly been split in half. The victim's injuries far exceed the requisite level of "serious bodily injury," which could have been satisfied by the victim's extensive bruising alone. See Tenn. Code Ann. § 39-15-402(d). We affirm the application of this factor.

With respect to enhancement factor fourteen, the defendant abused a position of trust, our supreme court has stated that an adult "occupies a position of 'presumptive private trust' with respect to the minor" when the adult and child are members of the same household. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (citing State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). The Defendant was married to the victim's mother, lived with the victim and her mother, and took care of the victim while her mother was at work. We affirm the application of this factor.

The Defendant also argues that the trial court erred in finding his proposed mitigating factors, except for his lack of criminal history, to be applicable. He asserts that the trial court should have applied the mitigating factor (11), which provides that the offense was committed "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motived" the crime, and mitigating factor (13), the "catch-all" factor. The Defendant specifically argues that under factor (13), the trial court should have found his military service, remorse, potential for rehabilitation, and that he performed CPR on the victim. The record reflects that the trial court considered all of the Defendant's proposed mitigating factors and found only one, his lack of criminal history, to be applicable. As we noted, the trial court is guided by, but not bound by, any applicable enhancement or mitigating factors when imposing a sentence, and we will not disturb a trial court's sentence unless the court wholly departed from the purposes and principles of the Sentencing Act. See Bise, 380 S.W.3d at 706. The trial court carefully considered the Defendant's proposed mitigating factors and enhancement factors and chose not to sentence the Defendant as an especially mitigated offender, as is its province. The Defendant is not entitled to relief.

## V. Cumulative Error

The Defendant finally argues that the cumulative effect of the errors at trial warrants reversal, even if none of the errors do so individually. However, having found

no errors, we respectfully disagree and conclude that the Defendant is not entitled to relief on the basis of cumulative error.  See State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE